Okay next up is 22-8022 Western Watershed Project v. BLM. And let's see going first is Ms. Angels. Park. Park, okay. Sorry about that. There you are. You may proceed when you're ready. Thank you. Good morning. I'm Wendy Park representing Appellant Conservation Groups in our challenge to the Bureau of Land Management's approval of the Normally Pressured Lands Gas Field Project in Wyoming's Upper Green River Valley. This project allows Jonah Energy to develop 3,500 gas wells, hundreds of miles of pipelines and roads, and 11 massive gas-gathering plants, an important habitat for two iconic Wyoming species, greater sage-grouse and pronghorn. My argument today will address three issues. First, BLM's failure to require phased development in sage-grouse priority habitat in violation of the Federal Land Policy and Management Act's conformity requirement. Second, BLM's failure to gather information about baseline conditions in winter concentration areas, which prevented it from forecasting the project's effects on BLM's failure to take a hard look at the project's risk of losing the extraordinary Grand Teton Herd and the Path of the Pronghorn, one of the longest land migrations. So turning first to BLM's failure to require phased development, the land use plans governing the NPL project area required BLM to impose this required design feature in sage-grouse priority habitat, unless BLM demonstrated that one of two narrow exemptions applied. But here BLM specifically rejected requiring phasing in priority habitat, and it did not claim that an exemption applied, nor did it much less demonstrate that an exemption applied. And that failure to require phased development, or explain why it was waived here, violated FLPMA's conformity requirement that all actions conform to the governing land use plans. So BLM has suggested, well could you could you back up and talk about the forfeiture argument that's being made here as far as that's not been administratively exhausted, this argument? Sure, your honor. So we did not have to exhaust this claim because there are two exceptions to exhaustion, both of which we meet. So the first exception is if the issue is obvious, and here the issue was obvious because BLM considered this independently. It had an between a Jonah and its staff regarding whether this phase development requirement should apply. And it was basically what the district court said, is that it was aware of the phase development requirement or the amendment. But being aware of something and dealing with it openly in communications doesn't mean that it's an obvious error not to include an explicit statement about that. I don't see the equation between awareness and the obvious flaw. Well it was, it specifically worked with Jonah to determine whether this this phase development requirement should apply to the project area. So it created this table which is in the record which laid out every single required design feature. And then it had Jonah's explanation for why it required that or why it incorporated that in its project or why it did not. And it also laid out BLM's position whether it agreed that that feature should apply or not. So in alternatives A and alternatives B, alternative A had a phasing requirement. It shows alternative B. But this is obvious to you all along that there's these two alternatives that they're considering an alternative and they ultimately decided on an alternative that didn't have a phasing requirement. And yet there was no objection to that, no comment about that. We don't hear about that until this appeal. Well we didn't have an opportunity to, I mean alternative A was always in the running until the very end. But you never said, oh well alternative A is the only choice because it's mandatory. Well alternative A was always in the running. We didn't know what BLM would choose in the end and it wasn't until BLM actually made its final decision that there was an explanation for why it chose alternative B over alternative A. So we couldn't object to that reason because it wasn't made plain until the final decision. But isn't it your position that there shouldn't even have been an alternative B? Phasing was required, it's mandatory, unless there's an exception which you don't think applies here? Right, but BLM could have determined that an exemption applied and that you know and chosen alternative B on that basis. But in the end it chose alternative A which did not require phased development but without claiming any exemption. Counsel, how are we to think about the exhaustion issue in this appeal? Are we reviewing the district court's for an abuse of discretion or are we thinking about it in the first instance? So the standard that applies here to the district court's decision to weigh the exhaustion requirement is an abuse of discretion standard. And you know as I've laid out that the district court's decision was correct because it did, because BLM was aware of this requirement and appellees haven't shown how this decision to weigh the exhaustion requirement was an abuse. So don't you really, isn't the way BLM designed this proposal or its approval, they're going to effectively require the developer, Jonah, to demonstrate certain factors at the back end when they seek the exploration permits. And at that point there's going to be a NEPA type evaluation of the resource impacts of the drilling. Why isn't that really functionally the equivalent of a phasing proposal that's required by the policy? Well first of all, to clarify, BLM never made a determination that it would require phasing at the, or it would consider phasing at the drilling stage. Isn't that what they're doing? They're looking at permit applications and looking at the impact on the surrounding environment, including the sage grouse and the pronghorn as a part of that. How does that really meaningfully differ from them saying in the first instance, you know, we're going to phase it in by looking at these at the permit level. You know, isn't that really what's happening in the real world here? Well, so in the real world what they're going to need is some kind of direction as to how to do the phasing. And that was a planning level or programmatic decision that they had to make up front. So the decision to allow development in certain areas and to prohibit in others across several stages, that was not a decision that could be made at the individual well approval stage. They have to actually have an overall plan. And so the decision to direct where development should begin and when it can begin in other areas, that was a planning level decision that they had to make. But I want to emphasize too that BLM specifically did not actually require phasing. They made a decision not to authorize or to authorize development simultaneously throughout the project area. And they specifically stated that development in the development areas is not required to be sequential or phased over time. Wouldn't the phasing only have applied to development area three? That's true, your honor. So alternative A did consider phasing across the entire project area, but it also included phasing in development area three. And that phasing would have occurred from north to south across three areas. So if there are no other questions on the baseline information concerning the use and role of winter concentration areas, which it openly acknowledged it needed to understand the project's effects and to determine appropriate mitigation in winter concentration areas. And that included information about the boundaries of winter concentration areas that sage-grouse congregate in and the location of key to defer any development in winter concentration areas until it collected this information. But then in its decision, it decided to use the project to test the project's effects. And it did so by authorizing a quote, limited amount of development and a concurrent study to test those effects. This experimental approach violated NEPA's critical timing requirement to study project effects before authorizing actions. And by not collecting this baseline information before approval of the experimental study, BLM here is risking irreversible harm to thousands of birds in winter concentration areas and core area populations before the study results could be ready and before BLM would have the opportunity to correct course. I'd like to better understand how the information here that you're contending is missing, that was needed for this baseline assessment, isn't just sort of extra. It would be useful, but it wasn't required to make an informed choice, which is a legal standard we're looking at. Well, BLM itself stated that it needed this information to forecast the project's environmental effects and to determine appropriate mitigation measures. So it was essential to its decision making. And it's also, it was required to collect that, and because it actually admitted that it needed this information, it was essential to reason choice here. So BLM made a choice to allow thousands of wells, pipelines, roads. But they haven't. They haven't allowed them. I mean, they're going to do, they have to do site-specific reviews, and that's the BLM's argument here, is this isn't an immediate, on-the-ground decision like the cases that you cite in support of your argument here. This is something that they can consider, isn't it, as they do the site-specific reviews? Right, but it did make very specific choices as to the overall amount of development that should be allowed, as to what types of in winter concentration areas, and those were very limited development restrictions, such as on timing and on the density. Can they add restrictions later through the site-specific reviews? They could, but the problem is that there's a risk of irreversible harm here by authorizing this quote-unquote limited development before knowing what the actual effects are. They're risking the loss of these important areas. They concluded that the project would have a negative effect on the sage grouse. I mean, I think they agree with you that there's going to be some degradation of the grouse habitat, and you know, as I look at, you know, as each well is requested, we're going to look at where it is and what additional effect it's going to have on the population here. You know, is that an arbitrary approach? You know, why wouldn't that be permissible under, at least at the NEPA stage? Well, because BLM again said that it needed this information to actually forecast how populations would be harmed and what were the appropriate measures to mitigate that harm. So, but it never explained why it no longer needed that information and why this experimental approach was more appropriate. If I could reserve the last 30 seconds of my time. I'll give you some additional rebuttals. Thank you so much. All right. Okay. Apologize for putting you on the wrong side of the case, but we'll get that. Thank you. No apology necessary. Good morning, your honors, and may it please the court. I'm Summer Ingalls. I'm joined today by counsel for the state of Wyoming, Travis Jordan, and counsel for Jonah Energy, Katie Schroeder. My intention is to use 11 minutes of our time and reserve the remaining four for them to split evenly. We ask the court to affirm. BLM approved a project that balanced the protection of wildlife with the development of oil and gas resources consistent with FLIPMA, and it also took a hard at the project's effects on sage-grouse and pronghorn under NEPA at this early programmatic stage. I'd like to begin today by addressing the agency's compliance with FLIPMA, and I'll begin with the forfeiture point. Plaintiffs here assert that the agency didn't apply the required design features appropriately and failed to make a particular finding that an exemption applied, but they do not dispute the fact that none of their comments during the administrative process, although there were voluminous comments, mentioned the phasing feature or any specific requirement to make a particular finding. So what way are you contending the court, district court, abused its discretion there? Our contention is that the district court abused its discretion in misapplying the exemption set forth in Public Citizen for requirements so obvious that they need not be stated in comments. As we explained in our brief, the district court basically explained that there was no need to mention the agency's compliance with FLIPMA because it was well aware of its need to comply, and it already considered phasing. Plaintiffs are asking now for something much more specific, which is the need to make a particular finding, and the court made clear in Vermont Yankee that although an agency may be well aware of its obligation to comply with the statute, it's still incumbent upon interveners who wish to participate to structure their participation so that it is meaningful and so that it alerts the agency to the intervener's position and contention. What case was that? It's Vermont Yankee 435 U.S. 519 at 533. And we submit that the comments submitted here, which mentioned neither phasing nor the need to make a particular finding, did not preserve petitioner's interest in seeing phasing included in the final alternative that was selected. Ultimately, the agency... Well, they say they couldn't really know until you selected the final alternative that you weren't going to explain or make this specific explanation that they're looking for. They didn't really have a chance because maybe they assumed you would. I think that this is one of those situations where if they were looking for that, they needed to make the request. It's not sufficient to wait to see if the agency's complied by the end if they're looking for something very particular like this. They were involved in the process of compiling the draft environmental impact statement. That's where they submitted comments. They have the final environmental impact statement. Of course, the comments need to be submitted. If the party's interested, again, it's incumbent on them to flag their interest for the agency while it's preparing its analysis. Ultimately, the amendments make clear that the agency has quite a broad discretion to decide which design features to apply based on the project at issue, the phase at which the project is being reviewed, programmatic versus site-specific. The agency made clear here, although it had not adopted alternative A, which is the alternative that included phasing, this is from the ROD, it would develop site-specific permitting and all disturbances and priority habitat would be analyzed to determine compliance with the amendments and that the agency would apply appropriate required design features at that time. That's from the ROD, volume three of the appendix, pages 570 and 610. So why shouldn't the agency have explicitly discussed and explained an exception that applied? Well, the relevant language says demonstrate, and we read demonstrate to be discrete from what we understand plaintiffs to be requesting here, which is some statement for each of the 90-odd design features that a particular exemption applies. The relevant language in the amendment say that the application or non-application of these exemptions should be demonstrated in NEPA analysis, and here where the agency considered a project alternative as one of the four alternatives in its environmental impact statement that included phasing and ultimately explained why a different alternative without phasing would better carry out FLIPMA's mandate to manage natural resources in a way that promotes balance. The agency complied with that obligation here, even though it didn't say specifically we're applying exemption one, two, or three. The careful analysis is there, and also the agency selected an alternative that was well aware of the need to protect the sage-grass habitat. The alternative ultimately selected is one that was designed to incentivize development in less environmentally sensitive areas, and the work would be clustered to conserve larger areas of uninterrupted open space. Ultimately, the alternative that was selected included less service disturbance than both the proposed alternative and alternative A, and the final fact can be verified at volume three of the supplemental appendix, pages 748, and volume three of the appendix at pages 650 through 51. Cognizant of the fact that I have only five minutes remaining, I'd like to turn to the agency's NEPA analysis and specifically its analysis of effects on sage-grass and pronghorn. Why was it appropriate for the agency to essentially use the project to test its characterization of that being exactly what the agency did here? To be clear, it said that there would be limited development proceeding in winter concentration areas, but again, all of this surface disturbance in winter concentration areas will first be limited, and will also be analyzed at the site-specific level when APDs are submitted. So this project does not authorize any site-specific disturbance, but the agency also explained that the information it was looking to provide in that additional analysis was not the sort of baseline information that petitioners assert, but was instead a more refined, more sophisticated, more nuanced understanding of information it already had. The agency explained that additional studies should be conducted to better understand the use and role of winter concentration areas on sage-grass, and so it explained that it would authorize the project at this programmatic stage, but that additional research should be done before any ground disturbance proceeds, and it would be proceeding in a manner that kept eyes open to the fact that there could be additional impacts. And that's why the agency's adaptive management approach is really important here, and specifically its discussion in the ROD and in the environmental impact statements about Diliman's Scenario 2. This ensures that as information is developed, if it implicates the project at this sort of broad project development stage, and suggests that additional protections for sage-grass are necessary in winter concentration areas, that there will be protections in place for the sage-grass. So Development Scenario 2 could be applied based on what this study reveals. It would include phasing from east to west, bearing power lines, imposing a five percent disturbance cap every square mile, centralized about ground facilities. And so yes, the agency is moving forward in a way that will collect additional, more refined information, but the agency explained that it was not the sort of baseline information that it needed to authorize the project at this stage. As we explain in our briefs, the agency had already quite a bit of information about sage-grass and potential effects, and it disclosed that information to the public. Finally, the agency carefully took a hard look at the project's effects on pronghorn. It explained that there could be potential effects on migration. Ultimately, the path of the pronghorn, which is discussed in petitioner's briefs, occurs well outside of the project area. The agency was aware of its existence. It is marked on maps. It's discussed in the record, but the agency's decision to analyze the project's effects at the level that it did was completely appropriate with NEPA and ensured that it took a hard look at those impacts. If the court has no further questions for me, I will leave the rest of my time to the defendant interveners. Thank you, your honors. May it please the court. Travis Jordan for the state of Wyoming. As the court is aware, the state manages the wildlife at issue in this case, both pronghorn and sage-grass. I'll leave off where my colleague from the federal government stepped down, and that's with respect to the pronghorn. The groups raised an issue in their reply brief that suggests that the path of the pronghorn, that corridor extends in the project area, and the state would dispute that. The record disputes that. Specifically, the only thing the groups rely on is a letter from the National Park Service which says that collared animals from Grand Teton National Park were identified in the project area. That's not what the letter says. The letter says that the collared pronghorn from Grand Teton National Park used the area for winter habitat, and that's what the BLM did correctly, was focus on protecting winter habitat within the project area after responding to Wyoming Game and Fish's recommendations for protecting that winter habitat. Did they consider the Teton pronghorn and the path of the pronghorn as part of the evaluation, or did they completely disregard potential impacts on that herd? Your honors, the district court notes the BLM did, basically, very candidly said there was a significant loss of pronghorn with respect to migration. Including the Grand Teton herd? Your honor, and that's where we get to herd unit 401. So the BLM analyzed herd unit 401, which is the Wyoming Game and Fish designation for a large portion of western Wyoming. There's no dispute in this case that that herd unit includes those pronghorn that happened in summer in Grand Teton National Park. Moreover, the science in the case, going to the question, the Bureau included science in the determination, both Seidler 2014, the Berger study from 2006, which the groups rely on, both at appendix, groups appendix two, pages 393 and 436, that indicate that the path of the pronghorn terminates 30 miles north of the project area. In this respect, the district court correctly concluded in footnote six of its order that Trapper's Point, which is a human-based bottleneck outside of the project area, was largely the last migration bottleneck of that path of the pronghorn wildlife corridor. Speaking briefly to Sage Grouse, the state would just want to correct something that was said earlier by the groups that would suggest that the BLM acted without any baseline information. However, the Wyoming Game and Fish provided a significant amount of data to the BLM to help delineate winter concentration areas. If the court looks to the group's appendix, volume three, page 662, the Wyoming Game and Fish delineated 27,000 acres of winter concentration area within the project area. That was relied on color data from 2005 through 2011, as well as aerial overflights, and then also it included data on surface geology, which is the geophagy issue. The question really is, the outstanding information is not where the winter concentration areas are. It's more of how does Sage Grouse use the winter concentration areas that Wyoming Game and Fish designated, which really goes to the earlier question about site-specific permitting. With the additional information the Bureau will be seeking, with the support of the scientific community, the idea is that that will inform site-specific selection because we'll have a better idea of how Sage Grouse used the winter concentration areas, not necessarily the question of what is or where is the winter concentration area. With that in mind, I'd like to reserve the remainder of the time for Ms. Schroeder, who is here on behalf of the proponent. Good morning, your honors. I'm Kathleen Schroeder with Davis Graham and Stubbs, here on behalf of Jonah Energy. I'll very briefly leave the court with a few final points. I'd like to respectfully disagree with the characterization that the plaintiffs made, that they had no reason to believe how the Bureau of Land Management may lean with respect to phasing. I note that both in the draft and final EIS, the BLM designated Alternative B as its decision. Second, I'd just like to note that with respect to phasing, that we disagree with the characterization in their briefs that phasing cannot be accomplished at the site-specific phase, that it all depends on how development progresses and that's uncertain in this type of exploratory project. So thank you very much. Unless you have any further questions for me, I'll step down. Thank you. I think we have some rebuttal time for Ms. Park. Thank you, your honors. So BLM was well aware of the phasing requirement at Appendix 3, page 747. It specifically laid out what was required of required design features, including the exemptions that it had to demonstrate. There are a lot of design features. Are they required to go through each of them and apply an exemption to each? Yes, your honor. I mean, that's what the plan actually requires, that the agency must demonstrate whether it applies or not and what the justification for that would be. We did not need to tell BLM that it needed to engage in reasoned decision making. And I also would like to point out that other commenters raised that BLM should require phasing and therefore we did not need to exhaust because other groups raised it. I was going to give you two minutes, so why don't you continue until it counts up to a minute 30. Oh, okay. I appreciate that. I'll let you know when you're done. Thank you. So I think it's also important to understand that with regards to the merits of the claim, the rationale that was provided that I believe BLM's counsel referred to, that's a post hoc rationale that doesn't actually even go to whether BLM or whether phase development should be waived or not. That was a explanation as to why BLM chose alternative B over alternative A. It didn't even go to the specific criteria of the exemption, which is whether another measure provides equal or better protection. And it didn't even mention sage-grouse. It only did this generic balancing between general environmental values versus the BLM, again, could not make a reasoned choice as to what restrictions should apply, where those restrictions should apply, because it didn't even know the full extent of where sage-grouse gathered throughout the entire winter. I mean, they couldn't even define what limited meant. And there is no definition of that in the record of how much limited development they'll develop because essentially they were flying blind here. They didn't even know what the conditions were on the ground. I believe, yeah, with respect to the pronghorn issues, really the EIS here spent only three sentences addressing the path of the pronghorn. And even if the rest of the analysis regarding the general sublet herd could capture the Grand Teton herd, it was just so general that there's no indication in there as to whether the Grand Teton pronghorn would survive or not, whether that path of the pronghorn would continue. And therefore, BLM could not have make any kind of meaningful choice as to how to alter the project to save the path of the pronghorn. And if there's nothing else, then I will. I thank you. Thanks. Thank you. Thank you very much. Council is excused. The case is submitted and we'll proceed to the